Willie Lee Turner, the appellant, was convicted of felony murder and was sentenced to life imprisonment.
The State's evidence tended to show the following: Arthur Davis, a friend of the appellant's, went to the appellant's home in Sheffield, Alabama, on the morning of April 22, 1993, and washed the appellant's automobile as a favor to him. R. 713, 716-21. Davis testified that, while he was washing the appellant's car, a man drove up and spoke to the appellant. R. 721-24. After the man left, the appellant told Davis that he knew who had his safe, R. 725, which had *Page 1373 
apparently been stolen from the appellant sometime earlier. The appellant and Davis then got into another automobile owned by the appellant, a red Buick Electra convertible, and with the appellant driving, drove to Florence. R. 717-18, 726-28. While driving around Florence, the appellant asked Davis to find a baseball bat. 726-28, 738-40, 863. Davis directed the appellant to his ex-girlfriend's house, where they obtained a baseball bat. R. 738-40.
Davis testified that the appellant and Davis then picked up Dennis Summerhill at his house in Florence. R. 726-29. They then drove around in the area. R. 730. While they were stopped at a stop sign, the appellant had a conversation with Kenny Bates, who was in another car. R. 730. The appellant told Bates that he knew who had his safe. R. 731. They drove around in the area some more, and eventually went to the house of an individual named "Zap." Bates followed in his car. R. 731-33. They saw Zap and Billy Joe Shelby at Zap's house. R. 732. At this time, Jessie Howell, the appellant's brother, drove up. R. 734. Howell told the appellant that he knew who had the appellant's safe. R. 734.
Davis testified that they stayed at Zap's house for about one hour. R. 736-37. Then everyone but Zap left together and went to Sheffield. R. 742-44. The appellant drove his red convertible. Davis rode in the front passenger seat and Summerhill rode in the backseat. R. 742-43. Howell drove Bates's car and Bates and Shelby rode with him. R. 743-44. Howell followed the appellant. R. 745. They approached Sheffield on Atlanta Avenue and were stopped at a train crossing for about an hour. R. 744-46. They then proceeded across the railroad tracks and stopped briefly at Mimi's Lounge on Atlanta Avenue. R. 746-47. They all then left together and proceeded up Atlanta Avenue until the appellant saw Calvin Ricks driving his car. R. 747-48. The appellant pulled his car up beside Ricks's car and Howell pulled the car that he was driving behind Ricks's car. R. 749.
Davis testified that the appellant then exited his car, walked to Ricks's car, and asked Ricks where the appellant's safe was located. R. 750-51. The appellant grabbed Ricks by the collar and pulled him out of his car. R. 754. Then he dragged him toward a garden area, asking him more than five times where his safe was located. R. 756-57. Ricks responded that he did not know what the appellant was talking about. R. 757. After they arrived at the garden area, they fought for about eight minutes. R. 762. Davis testified that he saw the appellant strike Ricks, throw him to the ground, and straddle him. R. 759-61. He then saw Howell, who apparently had exited the car he had been driving, kick Ricks about two times in the face while the appellant hit him with his fist about three or four times. R. 759-62. Summerhill, who apparently had exited the appellant's car, then took the bat and struck Ricks on the head. R. 763-64.
Davis testified that the appellant and Summerhill then picked Ricks up, helped him walk to the appellant's car, told him to get into the car, and put him into the backseat. R. 767-70, 774, 873. Ricks was conscious at that time, resisted a little, and repeatedly stated that he had not taken the appellant's safe. R. 769-70. They then drove on Atlanta Avenue in the same direction from which they had come, with the appellant driving, Davis riding in the front passenger seat, Summerhill riding in the backseat, and Ricks riding behind Davis. R. 770-72, 774. Summerhill then gave the bat to the appellant. While the appellant continued to drive, he repeatedly told Ricks that Ricks was going to tell the appellant where his safe was located, striking Ricks across the leg with the bat each time. R. 773. They faced oncoming traffic, and the appellant told Ricks to lie down in the floorboard but he did not do so. R. 775-76. They came to a stop sign and made a right turn. R. 776. Summerhill then told Ricks to lie down, and he hit him on the head with the bat. R. 776. They drove to the front of Helen Keller Hospital and stopped at a stoplight there. R. 776-77, 779. At that point, Summerhill continued telling Ricks to lie down. Ricks resisted, and Summerhill hit him on the head with the bat. R. 777-78. Finally, Summerhill told Ricks that he would kill him if he did not lie down, and *Page 1374 
Ricks then did so. R. 778, 784. They then went to a park. R. 779-83.
Davis testified that when they arrived at the park, the appellant and Summerhill exited the car and grabbed Ricks, and they began to walk. R. 785-86. The appellant again asked Ricks where the appellant's safe was, Ricks responded that he did not know, and the appellant hit him across the shoulder with the bat. R. 786. The appellant then appeared to try to hit Ricks on the other shoulder with the bat, but Ricks ducked, and was hit in the head instead. R. 788-89. Ricks then fell to the ground. R. 789. Ricks stood up and began to walk off, and the appellant hit him across the leg with the bat, causing him to fall to the ground again. R. 791-93. Summerhill then took the bat, pulled Ricks to his feet again, and hit Ricks on the side of the head with the bat. R. 793-94. Ricks fell again. The appellant and Summerhill asked him about the safe, and he said that he would tell where it was. R. 79596. Then the appellant helped Ricks to his feet, and they took him to a nearby stream where the appellant tried to wash the blood from Ricks's face. R. 796-97, 801. Davis then saw the police and told the appellant and Summerhill that the police were there. Davis did not see the appellant again after that point. Davis and Summerhill ran through the woods. R. 802-03, 807-08.
Officer Jeff Lamon of the Sheffield Police Department testified that on April 22, 1993, the police department received several telephone calls concerning a fight. R. 38-39. After talking with his dispatcher, he drove his patrol car to Riverfront Park in Sheffield looking for a red convertible with a white top. R. 40-42. He parked his vehicle near the entrance of Park West. R. 42, 44. He then saw two men, one of whom was the appellant. R. 44-45. He shouted at them, and they ran away from him into the park. R. 44, 49, 52-53. Several other law enforcement officers, including Investigator Steve Guthrie of the Sheffield Police Department, joined Officer Lamon. R. 50-52. Less than 20 minutes after Officer Lamon saw the two men, the appellant emerged from the woods and was apprehended by Officer Lamon, Investigator Guthrie, and another officer. R. 52-53.
Investigator Guthrie testified that he arrived on the scene at about 4:00 p.m. R. 527-28. When the appellant was taken into custody, Investigator Guthrie went into the woods at the point where the appellant had emerged and found Ricks lying in a ditch. R. 537-38. He had a pulse, was breathing, and was conscious. R. 539-541. Medical help was requested, and Ricks was taken away by ambulance. R. 540, 547.
Dr. Ed Uhlman, medical director of the emergency department of Helen Keller Hospital on April 22, 1993, was present in the emergency room of the hospital that day, and testified that Ricks was dead when he arrived. R. 234, 236, 240.
Dr. Kenneth E. Warner, a forensic pathologist employed as a medical examiner by the Alabama Department of Forensic Sciences, performed the autopsy on Ricks. He testified that an external examination revealed a laceration over the right eyebrow, four lacerations to the side of the head, and a laceration on the back of the head. R. 318-22. Dr. Warner determined that Ricks was struck on the head a minimum of six times. R. 331. Dr. Warner determined the cause of death to be cranial cerebral trauma, which he explained was injury to both the skull and the brain. R. 330-31. He testified that Ricks died from a combination of the blows he received to the head. R. 332.
 I.
The appellant contends that the "the mandates ofBatson[1] and applicable Alabama law were not followed." Appellant's brief at 17. Before the qualification of the jury venire, defense counsel moved for a continuance and to quash the venire. R. 6. He stated that the jury list had originally contained the names of 225 venirepersons, but that the trial court had excused 105 of those venirepersons before trial without notice to the appellant. R. 4-5. A person identified in the record on appeal only as "the clerk" stated that only 120 names remained on the list. R. 5. A copy of the original jury list was admitted *Page 1375 
into evidence. R. 14. Defense counsel stated that there were 9 black venirepersons on that list who had been excused and that he had highlighted their names. He also stated that there were 29 black venirepersons remaining on the list and that he had highlighted their names. R. 16-17. The copy of the original list is not contained in the record on appeal. Both parties stipulated that the appellant was black. R. 17. The appellant's motion for continuance and to quash the venire was denied. R. 11, 15.
Following the qualification of the venire, defense counsel again made a motion to quash the venire and for a continuance. R. 21. He reemphasized the foregoing information, stating this time, however, that, "[a]ccording to my count on the list, and I have tried to be careful, only 18 blacks were on the original list." R. 22. He also stated that blacks constituted approximately 17% of the population of Colbert County and that 8% of the original venire of 225 was black. R. 22. Defense counsel further stated that after the qualification of the venire, 63 names remained on the list, and that 5 of those venirepersons, or 8%, were black. R. 22-23, 25. The appellant's motion was again denied. R. 25.
Following the voir dire of the venire, the appellant renewed his motion for a continuance and also moved for a mistrial in the alternative, stating as grounds this time that the remaining black venirepersons had been removed in response to challenges for cause. R. 26. The appellant's motions were denied. R. 29. Following the selection of the jury, defense counsel renewed all of his previous motions and moved to quash the jury. R. 35-36. The motions were denied. R. 36.
The appellant appears to argue that we should applyBatson to this case and hold that a prima facie case of a violation of the Sixth Amendment fair-cross-section requirement for jury venires is established by simply showing a substantial disparity between the percentage of the population of a distinctive group in the community and the percentage of its representation on the jury venire. This Court considered and rejected such a claim on virtually identical facts in Allen v.State, 641 So.2d 307, 308 (Ala.Cr.App. 1993) ("Blacks constitute approximately seven to ten percent of the population of St. Clair County; the 120-member venire was selected on the basis of driver's licenses; there were four blacks on the venire; two blacks were excused from jury service by the circuit clerk; one black did not appear for jury service; the remaining black veniremember was challenged for cause by the appellant and the challenge was granted by the trial judge"). "This is a Sixth Amendment fair-cross-section claim, not a Fourteenth Amendment equal protection claim. See Holland v. Illinois,493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). Batson does not apply to Sixth Amendment claims. Id." DeFries v. State,597 So.2d 742, 750 (Ala.Cr.App. 1992).
"In order to establish a violation of the [fair-cross-section] requirement, the appellant has the burden of proving a systematic exclusion of blacks resulting in their under-representation on the jury rolls. See Duren v. Missouri,439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)."Ford v. State, 628 So.2d 1068, 1069 (Ala.Cr.App. 1993). The appellant presented no evidence of systematic exclusion. Therefore, the appellant did not demonstrate a violation of the fair cross-section requirement. See Abernathy v. State,642 So.2d 519, 522-523 (Ala.Cr.App. 1994); Brundage v. State,585 So.2d 238, 239 (Ala.Cr.App. 1991).
 II.
The appellant contends that the evidence was insufficient to support his conviction. Alabama's felony-murder statute provides:
 "A person commits the crime of murder if . . . [h]e commits . . . kidnapping in the first degree . . . and, in the course of and in furtherance of the crime that he is committing . . ., he, or another participant if there be any, causes the death of any person."
§ 13A-6-2(a)(3), Code of Alabama 1975.
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense . . . [h]e *Page 1376 
aids or abets such other person in committing the offense . . ." § 13A-2-23(2), Code of Alabama 1975. " ' "Aid and abet
'comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.' " ' Gwin v.State, 456 So.2d 845, 851 (Ala.Cr.App. 1984), quoting Jones v.State, 174 Ala. 53, 57, 57 So. 31 (1911). See also Watkins v.State, 495 So.2d 92 (Ala.Cr.App. 1986)." Jones v. State,623 So.2d 389, 391 (Ala.Cr.App. 1993).
"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit it to the jury, and in such a case, this court will not disturb the trial court's decision." Ward v. State,557 So.2d 848, 850 (Ala.Cr.App. 1990). "In determining the sufficiency of the evidence, this Court must accept as true the evidence introduced by the State, must make all legitimate inferences from that evidence and must consider such evidence in the light most favorable to the State." Daniel v. State,623 So.2d 438, 441 (Ala.Cr.App. 1993).
The appellant specifically argues that the evidence as to who inflicted the fatal blows to Ricks is circumstantial, and that the evidence reflects that it was Summerhill, not he, who inflicted them. The appellant does not challenge the underlying felony of kidnapping in the first degree, and he does not allege that he did not hit Ricks on the head with the bat. Dr. Warner testified that Ricks died from a combination of the blows to the head. R. 332. The State presented direct evidence of the appellant's participation in the kidnapping and his participation in Ricks's beating, which caused Ricks's death. Applying the above law to these facts, we find that the evidence was such that the jury could have by fair inference found the appellant guilty.
 III.
The appellant contends that the trial court erred in admitting certain statements that he made to the police because, he says, they were inadmissible under Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 A.
Officer Lamon testified that, when the appellant emerged from the woods, the appellant "shouted that there was a man down there that needed help." R. 52. When the appellant was apprehended, Officer Lamon took him into custody and escorted him to his patrol car. R. 52. Officer Lamon testified that, while he was so escorting him, the appellant "laughed and said that there was a guy down there that needed some help, we better get an ambulance." R. 54-55, 60-61. Officer Lamon testified that neither he nor any other officer in his presence said anything to the appellant, that the appellant was not read his Miranda rights, and that this latter statement by the appellant was spontaneous. R. 55, 58. Officer Lamon further testified as follows: "[The appellant] just stated to me when he got in the [patrol] car, he said, every G [sic][2] has a bad day." R. 62-63. Officer Lamon testified that this statement was not in response to a question from him. R. 63.
 " 'Miranda has never been held to apply to statements voluntarily made by defendants. If a defendant spontaneously volunteers information, either before or after being given the Miranda
warnings, those statements need not be suppressed.' United States v. Edwards, 885 F.2d 377, 387 (7th Cir. 1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App. 1985) ('An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule'); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.) ('The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings.'), cert. denied, [503] U.S. [1011], 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992)." *Page 1377 
Worthington v. State, 652 So.2d 790, 792 (Ala.Cr.App. 1994). See also Sheely v. State, 629 So.2d 23, 29 (Ala.Cr.App. 1993);Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App. 1991). It is clear from the facts that the appellant's statements were volunteered and spontaneous and were not made during custodial interrogation. They were therefore admissible.
 B.
Investigator Guthrie met with the appellant at the police department on the afternoon of the murder. R. 564-65. Investigator Guthrie testified that after he was read hisMiranda rights, the appellant "asked if Calvin Ricks was dead." R. 566. The record reveals that, while defense counsel posed an objection when the testimony as to this statement was made, he merely objected "to any further statements about the conversation . . ." R. 566 (emphasis). Defense counsel never objected in the trial court to the statement he now challenges. Consequently, this issue is procedurally barred from appellate review. Pate v. State, 601 So.2d 210, 213 (Ala.Cr.App. 1992) ("An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented."); Brown v. State, 588 So.2d 551, 558
(Ala.Cr.App. 1991) (testimony as to statements that the appellant made to the police was not objected to at trial and could not be challenged for the first time on appeal).
For the foregoing reasons, the judgment is hereby affirmed.
AFFIRMED.
All Judges concur.
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986).
[2] Nothing in the record explains what the appellant's reference to "G" meant.