The appellant, Holly Wood, was convicted of murder made capital because it was committed during the course of a burglary in the first degree, see § 13A-5-40(a)(4), Ala. Code 1975. The jury, by a vote of 10 to 2, recommended a sentence of death, and the trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The state's evidence tended to show the following: On the evening of September 1, 1993, the appellant entered the Troy residence of Annie Gosha and shot and killed Mrs. Gosha's daughter, Ruby Gosha, with whom the appellant had formerly had a relationship and by whom the appellant had had a child.
Annie Gosha testified that on September 1, 1993, Ruby Gosha and Ruby's children were living with her at her house in Troy. Before moving in with her mother, Ruby had lived with the appellant in Enterprise, until their relationship ended. At around 5:00 p.m. on September 1, the appellant arrived uninvited at Mrs. Gosha's house, purportedly to bring Ruby some cigarettes and diapers for his child. Mrs. Gosha testified that the appellant and Ruby began arguing and that Ruby told the appellant to "go on and leave her alone, to take his cigarettes and [diapers] and give them to somebody else, because it was over between them." (R. 418.) Mrs. Gosha *Page 814 
stated that she also told the appellant to leave her property and to never come back. According to Mrs. Gosha, when the appellant left her house, he told Ruby that he would "get" her some day. (R. 420.)
Mrs. Gosha also testified that Ruby had told her that one night approximately two weeks before September 1, as she sat in her car, the appellant slipped up behind her and cut her on the arm or wrist, causing her to lose the function of two fingers.
At about 9:00 p.m. on the night of September 1, Mrs. Gosha and Ruby retired to separate rooms. Mrs. Gosha testified that as she was lying in bed watching television, she heard a "pop" or what sounded like a "firecracker shot." (R. 424-25.) She then went through Ruby's bedroom into the kitchen, where she saw that the door to the outside was open. When she returned to Ruby's bedroom, she found Ruby lying in bed. Ruby had been shot; there was a gunshot wound near her eye and one near her cheek. Mrs. Gosha then telephoned the police and an ambulance. Paramedics transported Ruby to the Edge Regional Medical Center emergency room in Troy, where Ruby was pronounced dead.
Willie Gosha, Ruby's brother and Annie Gosha's son, testified that he was also in Mrs. Gosha's house on the evening of September 1. He stated that as he was sitting on the bed in his room, he heard a door open and heard someone "creep through" it. (R. 440.) Shortly thereafter, he heard what sounded like a gunshot and then heard someone moving quickly back through the door.
Doctor Alfredo Paredes, a medical examiner for the Alabama Department of Forensic Sciences, performed an autopsy on Ruby Gosha. He testified that he recovered several lead shot pellets from the victim's head. He determined that the cause of death was a shotgun wound to the face that fractured the victim's skull, injuring her brain. Paredes testified that he also found a recent cut and recent bruises on the victim's palm and on the back of her left hand, two recent trauma-induced scars on her right forearm, a recent scar on her left forearm, and a recent scar on her left upper arm.
Calvin Salter, the appellant's cousin, testified that a few days before September 1, 1993, he went with the appellant to Annie Gosha's house to deliver some diapers to Ruby Gosha but that both Ruby and her mother told the appellant to leave. Salter testified that later that same day, he and the appellant saw Ruby at a shopping center. According to Salter, the appellant spoke with Ruby at that time, but Salter did not know what they talked about. Salter testified that sometime between 7:00 p.m. and 8:00 p.m. on September 1, the appellant came by his mother's house in Luverne and picked him up. The appellant was driving his father's pickup truck. The appellant and Salter then drove to Troy, with Salter driving. They drove past the Gosha residence and stopped on a nearby street, where the appellant left the truck and told Salter to circle the block. Salter circled the block and parked the truck, and shortly thereafter, the appellant returned to the truck. An automobile driven by a man named Amp went by, and the appellant told Salter to follow it. Salter testified that the appellant told him that if he caught Ruby and Amp together, he would kill Ruby. The appellant and Salter followed Amp's car until it passed the Gosha residence. The appellant then directed Salter to drive slowly toward the Gosha house, and when they neared the house, the appellant had Salter stop the truck. Salter testified that the appellant then took a 12-gauge shotgun from the gun rack of the truck, stuck it down his pants leg, covered it with his shirt, left the truck, and walked toward the Gosha house.
Salter testified that he parked the truck at a nearby apartment complex and made a telephone call at a public pay telephone. After making the call, he said, he began walking back to the truck, and the appellant, who was standing in the street behind the Gosha house, called out to him. Salter walked up to him, and the appellant said that he did not see Ruby at the house but that he was going back up to the house anyway. The appellant then walked toward the house again, and Salter went back to the pay phone and made another call. Salter testified that when he hung up the telephone, he heard a gunshot and returned to the truck. When he arrived *Page 815 
at the truck, the appellant was sitting in it. The appellant then said to Salter, "Let's go to Luverne." (R. 495.)
Salter testified that as he began the drive to Luverne, the appellant told him that he had shot Ruby while she was lying in bed asleep. Salter stated that the appellant said: "I shot that bitch in the head, and [blew] her brains out and all she did was wiggle." (R. 495.) He stated that the appellant then began throwing 12-gauge shotgun shells out the window. Salter testified that the appellant told him that he knew he had killed Ruby and that the police would be coming after him.
When Salter and the appellant arrived in Luverne, they went to the appellant's father's house. The appellant took the shotgun from the truck, and he and Salter walked to a nearby wooded area, where they buried the gun under some leaves. They then slept in a shed near the appellant's father's house.
Salter testified that the appellant had told him that sometime before the shooting he had attempted to stab Ruby in the heart but that Ruby had thrown her arm up to protect herself, and he had stabbed her in the arm instead.
Luverne Police Officer Clifton Wells testified that late on the night of September 1, 1993, he located a vehicle parked at the appellant's father's house that matched a description he had received from a "be-on-the-lookout" bulletin from the Troy Police Department. After the appellant's father told Wells that the appellant lived in the shed next to his house, Wells arrested the appellant there. Wells transported the appellant to the Luverne Police Department and placed him in a cell. Troy Police Officer Donald Brown entered the cell, informed the appellant of his Miranda rights, and performed a gunshot residue test on the appellant's hands. After the test was performed, the appellant was escorted from the department by Troy Police Officer Lewis Fannin. Wells testified that he was in the appellant's presence from the time the appellant was arrested until he was escorted from the department by Fannin, and that neither he nor any other officer ever told the appellant any details of the crime.
Officer Fannin testified that he transported the appellant from the Luverne Police Department to the Troy Police Department and that he engaged in no conversation with the appellant during the trip, but that the appellant stated the following to him during the trip: "You motherfuckers must think I am crazy. What do I look [like] going in somebody's house shooting them in the head while they are asleep?" (R. 713.)
Troy Police Officer Donald Brown testified that Calvin Salter was in the shed after the appellant was arrested. According to Brown, later on the night that the appellant was arrested, Salter led him and other officers to a wooded area near the shed, where, Brown said, they found a shotgun under some leaves.
Joe Saloom, a forensic scientist for the Alabama Department of Forensic Sciences, examined the shotgun recovered near the shed and the shotgun shell wadding and lead shot pellets found in the victim's head. Saloom testified that he found residue in the barrel of the shotgun, which indicated that it had not been cleaned since it was last fired. He determined that it was a 12-gauge single-shot Herrington and Richardson shotgun. Saloom testified that the wadding found in the victim's head was a "combination wad and shot column, or shot protector, . . . located inside a shot shell to hold the shot and cushion it from the detonation," and that it was expelled upon firing. (R. 804.) He testified that the wadding was a 12-gauge type and was consistent with the type of columns and wadding used in Remington shotgun shells and with the type of ammunition used in the recovered shotgun. He also determined that the pellets recovered from the victim's head were consistent in size and weight with "number 6 shot from a shotgun shell." (R. 805.)
 I
The appellant contends that the state used its peremptory challenges against prospective jurors in a racially discriminatory manner, in violation of Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Page 816 
The appellant specifically attacks the prosecutor's strikes of black veniremembers A.B. (juror number 17), J.G. (juror number 46), C.B. (juror number 73), S.N. (juror number 95), A.R. (juror number 115), S.S. (juror number 118), S.S. (juror number 119), E.T. (juror number 133), M.T. (juror number 134), and A.U. (juror number 140).
The appellant alleges that the prosecutor stated he struck veniremembers A.B., A.R., S.S. (juror number 119), E.T., M.T., and A.U. "because they had relatives or friends who had been convicted of a crime," appellant's brief at 20, but that the prosecutor failed to strike two white veniremembers who indicated on the juror questionnaire that they had relatives who had been prosecuted. The appellant asserts that this constituted disparate treatment. However, "[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made." Johnson v. State,648 So.2d 629, 632 (Ala.Cr.App. 1994). The appellant has not attacked the additional reasons given by the prosecutor for striking these veniremembers, which are listed below:
1. A.B. indicated that she did not want to serve on the jury because she had a dental appointment.
2. A.R. indicated that he did not want to serve on the jury; he stated that he needed to be at work so that he could earn the money to meet his child support obligations.
3. S.S. (juror number 119) had had contact with the police department under what was logged by the department as "suspicious circumstances."
4. E.T. indicated that she did not want to serve on the jury; she stated that "she doesn't want to do none of this" and indicated on her jury questionnaire that she feared for her safety and the safety of her family if she served. She was also an alcoholic.
5. M.T. did not want to serve on the jury because he was a college student and was concerned about missing exams.
6. A.U. was a correctional officer who stated that he was not opposed to parole, did not believe in an "eye for an eye," and did not believe the courts were too lenient in sentencing criminals; the prosecutor was concerned that he had become sympathetic to the prisoners he was guarding.
 "The trial court evaluates an objection to the use of peremptory challenges under the three-step analysis set forth in Batson. First, as we have said, a defendant must make a prima facie showing that the state has exercised a peremptory challenge or challenges on the basis of race or gender. Second, once a prima facie showing has been made, the burden shifts to the state to articulate a race- or gender-neutral explanation for striking the prospective jurors in question that is related to the case to be tried. Batson, 476 U.S. at 98
[106 S.Ct. at 1723-24]. The United States Supreme Court recently stated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 [131 L.Ed.2d 834] (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at 768, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859 [1868-69, 114 L.Ed.2d 395] (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations, and it is also at this stage that 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination' Purkett, 514 U.S. at 768, 115 S.Ct. at 1771." *Page 817 
Bush v. State, 695 So.2d 70, 96 (Ala.Cr.App. 1995). "Since the release of Purkett a party's burden of proving that strikes were not violative of Batson is not as great as it was before the release of Purkett." Trawick v. State, 698 So.2d 151, 157
(Ala.Cr.App. 1995).
Here, as in Bush, the explanations were not "implausible or fantastic." Because the reasons given for striking veniremembers A.B., A.R., S.S. (juror number 119), E.T., M.T., and A.U. included race-neutral reasons, we are not required to address the reasons the appellant challenges as discriminatory.
The appellant alleges that the prosecutor stated that he struck veniremembers A.B., C.B., S.N., A.R., and S.S. (juror number 118) "because they were basically opposed to the death penalty and did not believe in an eye for an eye." Appellant's brief at 20. He further alleges that the prosecutor stated that he struck veniremember J.G. "because he was opposed to the death penalty based on religious beliefs." Appellant's brief at 21. The appellant asserts that this reason is not a race-neutral reason. However, it is well-settled that opposition to the death penalty is a race-neutral reason.Jackson v. State, 640 So.2d 1025, 1037 (Ala.Cr.App. 1992);Carroll v. State, 599 So.2d 1253, 1258 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171,114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); McGahee v. State,554 So.2d 454, 461 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala. 1989). With respect to J.G., the fact that the trial judge had denied the prosecutor's challenge for cause as to this veniremember is irrelevant to the present Batson inquiry, because "[a] prosecutor's explanation for his exercise of a peremptory strike 'need not rise to the level of a challenge for cause.'Ex parte Branch, 526 So.2d [609,] at 623 [(Ala. 1987)]," Fordv. State, 628 So.2d 1068, 1070 (Ala.Cr.App. 1993).
Finally, with respect to veniremember A.B., the appellant alleges that the prosecutor stated that he struck A.B. because "[she] touched the appellant as she passed him [as she walked by him to get her jury questionnaire]." Appellant's brief at 21. The appellant alleges that this was not a race-neutral reason because when A.B. "was questioned on voir dire as to whether or not she knew the appellant, she indicated she did not." Appellant's brief at 21. We need not address this reason, however, because we have already determined that the additional reason given by the prosecutor for striking A.B. — that she did not want to serve on the jury because she had a dental appointment — was race-neutral. Johnson, supra.
We find no violation of Batson in this case.
 II
The appellant contends that the evidence was insufficient to support his conviction for capital murder because, he says, the state failed to prove the elements of burglary in the first degree. § 13A-7-5, Ala. Code 1975. The appellant specifically argues that the state failed to prove that he "unlawfully enter[ed] or remain[ed] unlawfully" in Mrs. Gosha's house because, he argues, "no evidence [was] presented that the deceased did not . . . invite the Defendant to speak with her again" when they spoke at the shopping center a few days before the crime, appellant's brief at 25, and because no evidence was presented that the appellant had broken into the Gosha house.
"A person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." §13A-7-1(4), Ala. Code 1975. In determining whether the state has made a prima facie case, our concern is not with what the evidence does not show, but with what the evidence does show.
Here, the evidence showed that the victim had told the appellant to leave her alone, that the victim and her mother had told the appellant to leave their property, and that her mother told him never to return. Furthermore, Mrs. Gosha, the victim's mother, specifically testified that if the appellant was ever on her property after she told him never to return, it was not by her invitation.
As to whether the appellant broke into the Gosha house, "[t]he common law requirement for a breaking has been omitted by the new criminal code." Hollins v. State, 415 So.2d 1249,1253 (Ala.Cr.App. 1982). See also Commentary to §§ 13A-7-5
through 13A-7-7, Ala. Code 1975 ("To establish burglary the *Page 818 
prosecution must prove: (1) The intruder 'entered or remained unlawfully,' as that term is defined in § 13A-7-1(4). There is no requirement that a technical breaking be established."). The evidence presented by the state was sufficient to prove a prima facie case of burglary in the first degree and there was therefore sufficient evidence to support the appellant's conviction for capital murder.
 III
The appellant contends that the trial court erred in allowing the victim's mother to testify that approximately two weeks before the murder, the victim had told her that the appellant "slipped up behind her and cut her on the arm." (R. 422.) Error in the admission of this testimony, if any, was harmless. "[T]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred." White v. State,650 So.2d 538, 541 (Ala.Cr.App. 1994). After the victim's mother testified, Calvin Salter testified, without objection, that the appellant had told him that before the murder that he had once attempted to stab the victim in the heart but that she had thrown her arm up to protect herself and he had stabbed her in the arm instead.
 IV
The appellant complains of error regarding the admission into evidence of the statement he made to Troy Police Officer Lewis Fannin while being transported from Luverne, where he was arrested, to the Troy Police Department. This statement was the object of the appellant's motion to suppress, which the trial court denied. On appeal, the appellant styles this issue as a challenge to the denial of his motion to suppress; however, it appears from the substance of his argument in his brief to this court that he is actually challenging the admission of certain testimony at trial concerning the statement. Officer Fannin testified at trial that the appellant told him the following when he was being transported to the police department:
 " 'You motherfuckers must think I am crazy. What do I look [like] going in somebody's house shooting them in the head while they are asleep?' "
(R. 713.) Fannin also testified that no police officer had supplied the appellant with any details of the murder before he took the statement quoted above. The appellant contends that it was error to allow Fannin's testimony that no one had told the appellant the details of the murder at the time he made the statement. He argues that Fannin's testimony was a conclusion or an opinion that had been "rebutted" by other evidence and that it allowed the jury to infer the appellant's guilt from the statement alone.
The appellant's claim that Fannin's testimony was a conclusion or an opinion is without merit. "[A] witness cannot testify to facts that are not within the witness's knowledge."Sheridan v. State, 591 So.2d 129, 133 (Ala.Cr.App. 1991). See also Charles W. Gamble, McElroy's Alabama Evidence, § 105.01 (4th ed. 1991). The appellant was arrested in Luverne and was taken to the Luverne Police Department; he was locked in a cell, and a warrant for his arrest was read to him and he was given his Miranda warnings. After a gunshot residue test was performed on his hands, he was transported to the Troy Police Department. On direct examination by the state, Fannin testified several times that neither he nor any other officer in his presence ever told the appellant any details of the crime. On cross-examination, Fannin testified that officers at the Luverne Police Department probably discussed the details of the crime while the appellant was being held there but he stated that he was sure they did not do so in the appellant's presence. Fannin explained that he instructed Luverne Police Officer Clifton Wells to stay with the appellant during the entire arrest proceeding and to see that no one discussed the crime around him, and that when he arrived at the department after the arrest, Wells told him that he had carried out his instructions. Any error in the admission of Fannin's testimony, and we do not conclude that there was any such error, was harmless because Officer Wells testified, without objection, at trial that he was in the appellant's presence from the time the appellant was arrested until he was escorted from the Luverne Police Department by Fannin *Page 819 
and then transported to Troy, and that neither he nor any other officer ever told the appellant any details of the crime.White v. State, 650 So.2d 538, 541 (Ala.Cr.App. 1994).
The appellant's claim that Fannin's testimony was "rebutted" is without merit as well. "[T]he fact that a witness has given inconsistent statements or accounts about an event or occurrence is not a ground for the exclusion of the witness's testimony." Bird v. State, 594 So.2d 644, 662 (Ala.Cr.App. 1990), rev'd on other grounds, 594 So.2d 676 (Ala. 1991). See also Poole v. State, 650 So.2d 541, 543 (Ala.Cr.App. 1994).
Finally, we note that had the appellant argued on appeal that his statement should have been suppressed, we would find the claim to be without merit. The testimony, during the suppression hearing and at trial, of Troy Police Officers Fannin and Donald Brown and the testimony at trial of Luverne Police Officer Wells established that the appellant had not yet been questioned when he made the statement. His statement was spontaneous and voluntary and therefore admissible. SeeTurner v. State, 674 So.2d 1371 (Ala.Cr.App. 1995).
 V
As required by Rule 45A, Ala.R.App.P., we have searched the entire record for any plain error and have found none.
As required by § 13A-5-53, Ala. Code 1975, we have also reviewed the propriety of the appellant's death sentence. No error adversely affecting the rights of the appellant was made in the sentencing proceedings. The trial court found the following three aggravating circumstances: that the murder was committed while the appellant was under a sentence of imprisonment; that the appellant had previously been convicted of a felony involving the use or threat of violence to the person; and that the murder was committed during the course of a burglary. The trial court found no statutory or nonstatutory mitigating circumstances. These findings are supported by the evidence. We are convinced that the sentence of death is proper; it was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances leads to this conclusion, and the sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant. In regard to this last inquiry,
 "[w]e note that similar crimes are being punished capitally throughout this state. See Stewart v. State, 601 So.2d 491 (Ala.Cr.App. 1992), affirmed as to conviction, reversed as to sentence, with new sentencing proceeding ordered, 659 So.2d 122 (Ala. 1993) (murder/burglary and murder/kidnapping). See also Thomas v. State, 539 So.2d 375 (Ala.Cr.App.), affirmed, 539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709
(1989) (murder/burglary); Lynn v. State, 543 So.2d 704 (Ala.Cr.App. 1987), affirmed, 543 So.2d 709 (Ala. 1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989) (murder/burglary); Ford v. State, 515 So.2d 34
(Ala.Cr.App. 1986), affirmed, 515 So.2d 48 (Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988) (murder/burglary)."
Land v. State, 678 So.2d 201, 224 (Ala.Cr.App. 1995).
For the foregoing reasons, the judgment of the trial court convicting the appellant and sentencing him to death is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.