The appellant, Leigh Ann Lucas, appeals her conviction for capital murder. The victim was her two-and-one-half-year-old son, and the murder was made capital because the victim was under 14 years of age. See § 13A-5-40(a)(15), Ala. Code 1975. She was sentenced to life imprisonment without parole. *Page 1163 
 I.
The appellant argues that the trial court erred in denying her motion to dismiss count two of the indictment because, she says, the indictment failed to allege the means by which the murder was committed.
Count two of the indictment charged as follows:
 "Leigh Ann Lucas . . . did . . . intentionally cause the death of Brandon Austin Lee Steele, a child less than 14 years of age, having been born on or about November 24, 1994, by knowing that her child, a child approximately two and one-half years old, was critically injured and in immediate need of life-saving medical services, she intentionally caused the death of the child by failing in her parental duty to provide said necessary medical services in violation of Alabama Code Section 13A-5-40(a)(15). . . ."
The indictment is clear, concise, and understandable. It states sufficient facts to enable the appellant to understand the nature of the crime charged and the particular acts against which she would have to be prepared to defend. See Huff v. State,596 So.2d 16 (Ala.Crim.App. 1991). Moreover, the language in the indictment referring to the appellant's failure to provide medical care stated the means by which she committed the charged offense. Cf. Hewlett v. State, 520 So.2d 200, 204 (Ala.Crim.App. 1987) ("Having been apprised of the crime he was charged with committing and the means [i.e., strangulation] by which he committed it, the appellant was not misled, nor was his ability to defend himself hampered, by the indictment's failure to set out the specific instruments by which he carried out the beating."). See alsoHarrison v. State, 384 So.2d 641, 643 (Ala.Crim.App. 1980). ("[A]n averment of the means, although one of substance and not of form, is not a constituent or essential element of the offense. The omission of such would render an indictment merely voidable rather than void.") Because the indictment substantially followed the language of that statute, and stated the means by which the offense was committed, the trial court did not err in denying the motion to dismiss. See Breckenridge v. State, 628 So.2d 1012
(Ala.Crim.App. 1993); Rule 13.2(a), Ala.R.Crim.P.
 II.
The appellant argues that the trial court erred in denying her challenge for cause of a prospective juror because, she says, the juror had a fixed opinion as to her guilt, based on newspaper accounts of the murder.
The record reveals that the trial court, the State, and defense counsel engaged in an extensive colloquy with a prospective juror who initially stated, during voir dire, that he had "mixed feelings" about the appellant's guilt because he had read a newspaper article about the victim's autopsy that mentioned prior injuries suffered by the victim. In response to defense counsel's questioning, the juror also stated that he felt that the defendant would have to prove her innocence. However, the record reveals that the trial court asked several follow-up questions, after which the juror unequivocally stated that he could set aside his opinions and base his decision on the evidence presented at trial rather than on what he had read in the newspaper. He also acknowledged to the trial court that he understood that the burden of proof was on the State, not the appellant, and that he could abide by that rule of law.
 "While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. . . . *Page 1164 
 "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. . . . This determination . . . is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. . . ."
Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989). See also Ex parteGrayson, 479 So.2d 76 (Ala. 1985). Additionally, in Perryman v.State, 558 So.2d 972, 977 (Ala.Crim.App. 1989), this Court held that "even though a prospective juror admits to a potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error."
Applying the aforementioned authority to the facts of this case, we conclude that the trial court did not abuse its discretion in denying the appellant's challenge for cause.
 III.
The appellant argues that the trial court erred in denying her motion for a judgment of acquittal because, she says, the State failed to prove a prima facie case. Specifically, she argues that the State failed to prove the element of causation, i.e., it failed, she says, to prove that her failure to provide medical care to the victim caused his death. In support of her argument, the appellant argues that the State did not establish that the victim would have survived if she had secured medical treatment earlier.
The evidence presented by the State tended to show the following: Dr. Leroy Riddick, a forensic pathologist employed by the State of Alabama, testified that he performed an autopsy on the victim. He testified that the victim had fresh bruises and abrasions, and an obvious enlargement of the left side of his chest. He testified that X-rays revealed that eight of the victim's ribs were broken and that they had been broken at least two months before he died. He testified that he also suffered a broken rib no more than 48 hours before he died, which injury would be consistent with a kick or push. He also testified that the victim suffered abdominal injuries that were sustained within the last 24 to 48 hours of his life. Dr. Riddick testified that the victim's abdominal cavity was inflamed and that it contained blood and bile. He further testified that the victim's intestines and bowel were perforated, allowing his digestive acids and bacteria to enter the abdomen. He stated that because the victim had a ruptured bowel, he would have been unable to eat, he would have been unable to walk, and he would have been in severe pain for several hours before he died. He also testified that the autopsy revealed that there was no solid food or liquid in the victim's stomach. Based upon the autopsy results, Dr. Riddick disputed the appellant's claim that she had given the victim chocolate donuts and four cups of Gatorade before he collapsed and was taken to the hospital. He testified that upon arrival at the hospital, the victim was dead and his body showed signs of rigor mortis, indicating that he had been dead for approximately two hours. Dr. Riddick testified that because he was a forensic pathologist he had no opinion on whether the victim could have survived the injuries. He did, however, testify that the proper course of treatment would have been to X-ray the victim's abdominal cavity and to repair the perforated bowel.
Dr. Marsha Raulerson, the pediatrician who was the physician in the emergency room on the morning of his death, testified that the victim's stomach was distended, that his hands were fisted and cold, that his body was cold and waxy, and that his *Page 1165 
head and chest were battered. It was her opinion that the victim had been dead for at least an hour before she saw him. She testified that when she attempted to empty his stomach, she found only air. Dr. Raulerson testified that when she asked the appellant what had happened to the victim, the appellant told her that he had been ill on Friday. The appellant also told her that her husband had pulled the victim out from under his bed that morning, and that he could not walk. The appellant told her that after she fed the victim breakfast, he slumped over with his mouth open. Dr. Raulerson testified that the condition of the victim's body was not consistent with the appellant's story. She testified that she notified the police concerning the victim and that she accompanied them to the Lucas residence to view the victim's room. She testified that the victim's bed was covered with vomit containing blood and bile. She also observed a puddle of blood underneath the victim's bed. She testified that the victim could not have eaten anything for "many, many hours" before he died. She testified that the appellant's mother informed her at the hospital on the day the victim had died that she had telephoned the appellant and her husband several times the day before trying to get them to come home and care for the victim. Dr. Raulerson testified that she had treated four or five children with symptoms similar to the victim's, and that, although in those cases the symptoms were caused by ruptured appendixes, the condition was treatable.
Christine Eiland, a licensed practical nurse, at D.W. McMillan Hospital, testified that she was working the Friday night shift when the appellant and her husband visited their newborn, the victim's sibling. She testified that she received a telephone call from the appellant's mother asking to speak to the appellant or her husband; the mother told her that the victim was sick and he was vomiting. Eiland testified that the appellant later told her that "she thought the little boy at home was sick because he was jealous of the newborn baby in the nursery." Eiland testified that she told her that she did not believe that jealousy would cause a child to vomit.
The appellant's mother, Jerri Griffey, testified that on the day before the victim died, she baby-sat for him while the appellant and her husband went to the hospital to visit their newborn who had been kept there for tests. She testified that she telephoned them at the hospital to let them know the victim was sick. She testified that the appellant's husband told her not to bring the child to the hospital. She testified that when they returned home, she and the appellant went to buy medicine for the child and that it was her understanding that the appellant and her husband were going to carry the child to the doctor. The appellant's mother testified that she had stayed with the child on Wednesday night while the appellant was in the hospital with her newborn. She testified that she saw the child on Thursday and that he had appeared to be fine. She testified that on Friday, she had noticed that the child's bed was stained and also that he had bruises and red marks on his face. She testified that when she asked the appellant what had caused the injuries, the appellant responded that the child was bruised from playing under his bed.
In the appellant's statement to police officers, the appellant admitted that the victim was unable to walk during the 48-hour period before his death. The State presented evidence that tended to show that the appellant and her husband attempted, on the morning of the incident, to conceal the victim's death by claiming that he had a virus and purchasing soup and a soft drink for him when he was in fact *Page 1166 
already dead. The State presented evidence that vomit-and bile-soaked towels were found in the house, indicating that an attempt to clean up had occurred after the victim had vomited. The State also presented evidence that, upon returning home from the hospital after the victim's death, the appellant and her husband began to wash the towels in an apparent attempt to destroy the evidence.
The State presented the testimony of Timmy Gibson, a friend of the appellant. He testified that he was in their home in 1997 when he observed the appellant grab the victim by the hair and shove him. He also testified that she called him "a little dirty mother f_____" and other abusive names.
Melanie Butts, a friend of the appellant who is employed as an emergency medical technician, testified that, approximately one week before the victim's death, she had observed a bruise around his wrist. She testified that the appellant told her that the victim had pinched himself. She testified that, in her opinion, the bruise was too big to be a pinch mark. She also testified that the victim had a bald spot on the back of his head. The appellant told her that the victim had pulled out his hair because he was mad.
Lynn Rowland, a social worker with the Escambia County Department of Human Resources, testified that she interviewed the appellant on the day the victim died. The appellant told her that she had noticed that the victim was vomiting green liquid the day before but believed that this vomit was caused by peas he had eaten. The appellant stated that on Friday evening she and her mother had purchased over-the-counter medicine for the child. She told Rowland that her husband had awakened her on Saturday morning and said that the victim's color was "wrong." Rowland testified that the appellant gave conflicting statements regarding whether the victim could walk — first stating that the victim walked with a limp and later stating that he could not walk. The appellant told her that she had bathed the victim, and had fed him donut holes and Gatorade and that he did not vomit. The appellant also told Rowland that the victim had asked her for some of her coffee, some sunflower seeds, and some Coke. Rowland testified that the appellant told her that after she had gone to the kitchen to get more Gatorade, she returned to find the victim slumped over and nonresponsive. Roland testified that she asked both the appellant and her husband why the victim had so many bruises and abrasions, and both stated that he had been an active child, and that he regularly got up under his bed. The appellant told Rowland that the bruise to the victim's head was a result of a fall.
"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit it to the jury, and in such a case, this court will not disturb the trial court's decision." Ward v. State, 557 So.2d 848,850 (Ala.Crim.App. 1990). "In determining the sufficiency of the evidence, this Court must accept as true the evidence introduced by the State, must make all legitimate inferences from that evidence and must consider such evidence in the light most favorable to the State." Daniel v. State, 623 So.2d 438, 441
(Ala.Crim.App. 1993).
Turner v. State, 674 So.2d 1371, 1375-76 (Ala.Crim.App. 1995).
Additionally, in Lockhart v. State, 715 So.2d 895, 899
(Ala.Crim.App. 1997), this Court, in discussing circumstantial evidence, stated:
 "Circumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing *Page 1167 
unequivocally to the defendant's guilt. In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might so conclude."
(Citations omitted.)
Here, there was compelling circumstantial evidense of the appellant's failure to provide medical care to the victim. As stated earlier, there were numerous conflicts in the evidence regarding the victim's food intake, his ability to walk, and in the accounts of how he had suffered numerous bruises and abrasions. It is clear from the evidence that the appellant was aware of the severe nature of the victim's injuries and that she attempted to conceal those injuries. Cf. Woods v. State,724 So.2d 40, 48 (Ala.Crim.App. 1997) (in affirming a conviction for child abuse, this Court held that "[a] responsible person who willfully denies medical treatment to a child who is obviously seriously injured is as culpable as a responsible person who actually causes the injury to a child"). Medical testimony established that the victim's life-threatening injuries to his intestines and bowel occurred at least 24 to 48 hours before he arrived at the hospital. Doctors testified concerning the seriousness of the victim's injuries. There was undisputed testimony that the condition was treatable. Given this evidence, the State sufficiently proved that the appellant intentionally caused the death of the victim by failing to provide medical care. See § 13A-2-5, Ala. Code 1975 ("A person is criminally liable if the result would not have occurred but for his conduct. . . .").
In Albright v. State, 280 So.2d 186, 190 (1973), this Court stated:
 "The law of neglect or omission as the same relates to infant children comes to us from the ancient common law being grounded upon a status relationship of paternal support, care, protection and nurture. An obligation imposed by law carried with it the corresponding legal duty to meet and discharge the responsibility. Willfully allowing one to be exposed to conditions which will probably result in death, where there is a duty to protect such person, constitutes murder. To create criminal responsibility for death resulting from exposure, there must be neglect to perform a legal or contractual duty which accused was bound to perform. State v. Berry, 36 N.M. 318, 14 P.2d 434 [(1932)].
"The rule is stated in 29 C.J. on pages 1096 and 1097 as follows:
 "`The omission or neglect to perform a duty resulting in death may constitute murder where the omission was willful and there was deliberate intent to cause death, or where the omission must necessarily lead to death, so willfully allowing one to be exposed to conditions which will probably result in death, where there is a duty to protect such person, constitutes murder.'" (emphasis added [in Albright])
"Mr. Bishop, in discussing the subject, says:
 "`If the act is one of negligence not clearly showing danger of life, yet, if death follows, the offense is only manslaughter; whereas, if the exposure or neglect is of a dangerous kind, it is murder. Ordinarily, if a husband should withhold necessaries from his wife and she dies, it will be only manslaughter, since this act is not so immediately dangerous to life as the other. Whether death caused by neglect is murder or manslaughter is made to *Page 1168 
depend on the nature and character of the neglect.'
 "One who intentionally withholds food and liquids from a baby, so that it dies, or willfully exposes a helpless infant to freezing cold weather whereby it freezes to death, is guilty at common law of murder, and if the omission arises from negligence only it is a case of manslaughter."
See also State v. Tucker, 10 Haw.App. 43, 861 P.2d 24 (1993) (omission of a parental duty is the equivalent of an act and when death results, the standard for determining the degree of homicide is identical); State v. Batson, 73 Haw. 236, 253, 831 P.2d 924,933 (1992) ("A combination of individual acts of physical abuse and omissions to discharge parental duties and responsibilities, when coupled with the requisite state of mind, may rise to the level of murder."). Kohler v. State, 713 S.W.2d 141 (Tex. 1986) (murder conviction was supported by circumstantial evidence indicating that the defendants' intentionally failed to provide food and medical care for their child).
The State was not required to prove, as the appellant alleges, that the victim would have "survived" if the appellant had obtained medical care sooner. Whether the victim would have lived or died after receiving "life-saving" and "necessary" medical care would in no way alter the appellant's parental duty to provide that care. To require the State to prove, as an element of the offense, that the victim would have survived if medical treatment had been made available to him would require the proof of an uncertainty. Such a requirement would defeat the Legislature's intent in enacting § 13A-5-40(a)(15), which is to provide special protection for those children who are at such an age that they are dependent on their parents or guardians for every necessity of life. See MacEwan v. State, 701 So.2d 66
(Ala.Crim.App. 1997).
Viewing the evidence in the light most favorable to the State, the trial court properly submitted the case to the jury. There was ample circumstantial evidence from which the jury could infer the requisite element of intent. Conflicts in the evidence are for the jury to resolve. Ivey v. State, 710 So.2d 946
(Ala.Crim.App. 1998). The jury is able to test the credibility of witnesses and its decision in that regard will not be disturbed on appeal. Bone v. State, 706 So.2d 1291 (Ala.Crim.App. 1997). The question of intent is hardly ever capable of direct proof. Such a question is normally a question for the jury. Loper v. State,469 So.2d 707 (Ala.Crim.App. 1985). Because the State presented evidence from which the jury could have concluded that the appellant intentionally failed to provide necessary medical treatment to the victim and his death resulted from that failure to provide medical treatment, the element of causation was established. Here, the jury could reasonably find that the evidence excluded every reasonable hypothesis except that of guilt.
Therefore, the trial court did not err in denying the appellant's motion for a judgment of acquittal.
AFFIRMED.
Long, P.J., and Cobb, Baschab, and Fry, JJ., concur. *Page 1169