913 So.2d 1148 (2004)
Alan Eugene MILLER
v.
STATE of Alabama.
CR-99-2282.
Court of Criminal Appeals of Alabama.
January 6, 2004.
On Return to Remand October 29, 2004.
Rehearing Denied January 7, 2005.
Certiorari Denied May 27, 2005.
*1150 William R. Hill, Jr., and J. Haran Lowe, Jr., Clanton, for appellant.
*1151 William H. Pryor, Jr., atty. gen., and Tracy Daniel and Andy Scott Poole, asst. attys. gen., for appellee.
Alabama Supreme Court 1040564.
WISE, Judge.
The appellant, Alan Eugene Miller, was convicted of capital murder in connection with the deaths of Lee Michael Holdbrooks, Christopher S. Yancy, and Terry Lee Jarvis. The murders were made capital because they were committed "by one act or pursuant to one scheme or course of conduct." See § 13A-5-40(a)(10), Ala. Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that Miller be sentenced to death. The trial court accepted the jury's recommendation and sentenced Miller to death by electrocution.
Miller raises a number of issues for this Court's review. However, our initial review of the record reveals that we must remand this case for additional action by the circuit court so that we may adequately address the merits of several of Miller's claims.

I.
On June 17, 2000, the jury returned an advisory verdict recommending that Miller be sentenced to death. Thereafter, on July 31, 2000, the circuit court accepted the jury's recommendation and orally sentenced Miller to death by electrocution. However, the Court advised the parties that as soon as it could it would enter written findings, as required by Alabama law.
At the conclusion of the sentencing hearing, Miller's trial counsel requested that the court appoint other counsel to represent Miller on appeal, stating, "the reason being that I need to be scrutinized as well as the facts in this case." (R. 1473.) The court granted trial counsel's request, and it appointed new counsel to represent Miller on appeal. On August 1, 2000, Miller's newly appointed appellate counsel filed a motion for a new trial on the ground that the verdict was "contrary to law and the weight of the evidence."
On August 24, 2000, the circuit court entered its written order sentencing Miller to death by electrocution. The following day, Miller's appellate counsel filed an amendment to Miller's previous motion for a new trial. Included in the amended new-trial motion was a claim that Miller's trial counsel was ineffective. The circuit court held an evidentiary hearing on the motion. At the evidentiary hearing, Miller's new attorneys focused on two issues: (1) the competency of Miller's trial counsel; and (2) Miller's mental condition at the time the murders were committed. Miller's trial counsel testified at length concerning his representation of Miller. New counsel also presented testimony from two mental health professionals regarding Miller's mental state at the time of the murders. Following the evidentiary hearing, the parties were given the opportunity to brief the issues raised during the hearing. On February 21, 2001, the circuit court summarily denied Miller's motion for a new trial. The court entered no written order and made no specific findings of fact as to the evidence presented during the evidentiary hearing. The case action summary merely indicated that Miller's new-trial motion was being denied.
Because the circuit court summarily denied Miller's motion for a new trial without making specific, written findings of fact, despite holding a hearing and receiving evidence and briefs regarding the claims asserted in the motion, we must remand this case to the trial court for it to make specific written findings of fact regarding each of the claims Miller raised during the hearing on his motion for a new trial. The circuit court's failure to make such findings *1152 hampers this Court's ability to fulfill its statutory mandate as set out in § 13A-5-53, Ala.Code 1975. "Because the trial court presided over the trial and the hearing on the motion for a new trial, we believe that that court is in the best position to make findings of fact regarding the appellant's claims." Tubbs v. State, 753 So.2d 1209, 1210 (Ala.Crim.App.1999); see also Davis v. State, 826 So.2d 894, 896 (Ala.Crim.App.2000); Stallings v. State, 793 So.2d 867, 869 (Ala.Crim.App.2000).

II.
Miller argues that the circuit court erred in determining that the facts of this case warranted a finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Specifically, Miller challenges the constitutionality of this aggravating circumstance, on the ground that this aggravating circumstance is "impermissibly vague and overly broad." He further argues that "[s]uch a standard has become meaningless in recent years precisely because the State has chosen to use this as a catchall and effectively made every murder worthy of capital punishment."
Before we can address the merits of Miller's claim, however, we must remand this case for the circuit court to make specific findings of fact regarding its finding that the murders committed by Miller were especially heinous, atrocious, or cruel, when compared to other offenses.
When considering whether a particular capital offense was "especially heinous, atrocious or cruel," this Court adheres to the standard set out in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
Here, the circuit court found that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. The court, in its sentencing order, stated merely:
"The Court finds the conduct of the Defendant constituted an intentional killing of two or more persons pursuant to one scheme or course of conduct [and] that this capital murder offense committed by the Defendant was especially heinous, atrocious or cruel compared to other capital murder offenses."
The court's order fails to comply with Ex parte Kyzer, because the trial court failed to make specific findings of fact as to why it believed that this aggravating circumstance existed. Although the circuit court made findings of fact in another part of its three-part sentencing order, those facts do not establish specific findings addressing the standard set forth in Ex parte Kyzer. See, e.g., Stallworth v. State, 868 So.2d 1128, 1168 (Ala.Crim.App.2001).
This Court has approved the application of this aggravating circumstance when the testimony has established that the victims were stabbed multiple times and that they suffered before they died. See Price v. State, 725 So.2d at 1062; Barbour v. State, 673 So.2d 461, 471 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Hallford v. State, 548 So.2d 526, 546 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). However, when a circuit court has found this aggravating circumstance to exist, this Court has required the court to make specific findings of fact explaining why this aggravating circumstance was applicable. We quote the circuit court's sentencing order in Barbour, where the court stated:
"`The Court does find that Roberts did suffer before she was killed, because *1153 she was savagely beaten by Barbour, Mitchell and Hester into a stupefied state or into a state of unconsciousness. In any event, she was rendered helpless. What Roberts's thoughts were during this attack, we will never know. However, common sense dictates that when attacked by three relative strangers, one must be fearful of their ultimate fate. Thus, Roberts suffered psychologically. In addition, the blows were surely painful.
"`The Court finds that based on a consideration of all the circumstances from the moment the attack began until Barbour, Mitchell and Hester left Roberts's home, the State has proved beyond a reasonable doubt that the capital offense was heinous, atrocious, or cruel. This legal conclusion is based on an amalgam of the case law on this subject. . . .
"`A summary of the facts is appropriate. Roberts was beaten into a helpless state. She was then raped by Hester as she lay helpless. Barbour concluded that she must die because she knew who her attackers were, and he stabbed her nine times with such force that two of the blows penetrated Roberts'[s] back. Barbour left the murder weapon protruding from Roberts'[s] chest. Barbour then set a fire or fires in an attempt to hide the criminal act. The fires resulted in some mutilation of Roberts's body.'"
673 So.2d at 471 (emphasis in Barbour).
We do not wish to question the existence of this aggravating circumstance. However, given that the circuit court found only one aggravating circumstance to exist that this offense was "especially heinous, atrocious or cruel compared to other capital offenses"we must remand this case to the circuit court for specific findings of fact as to why the court found that the murders were "especially heinous, atrocious or cruel" when compared with other capital murders.
For the reasons stated in Part I of this opinion, we remand this case for the circuit court to make specific written findings of fact as to the claims that Miller raised during the hearing on his motion for a new trial. In addition to the findings of fact, the circuit court shall include in its return to remand any documentary evidence it considered in making these findings, including, but not limited to, the mental health evaluation conducted on Miller by psychologists at Taylor Hardin Secure Medical Facility that was filed under seal with the circuit court and the mental evaluation of Miller by his expert, Dr. Charles Scott.[1]
For the reasons stated in Part II of this opinion, this case is remanded for the court to correct its sentencing order and make specific findings of fact regarding the existence of the aggravating circumstance that this offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Our remand of this case for the circuit court to correct its sentencing order should not be taken as a judgment on the merits of Miller's guilt-phase arguments. However, in the interest of judicial economy, we have simply chosen to have a single remand so that the circuit court can comply with Alabama law, in order that this Court may better review the merits of each of Miller's arguments, without the need for another remand.
The circuit court shall take all necessary action to see that the circuit court makes *1154 due return to this Court at the earliest possible time and within 90 days of the release of this opinion.
REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.

On Return to Remand
WISE, Judge.
Alan Eugene Miller was convicted of capital murder in connection with the deaths of Lee Michael Holdbrooks, Christopher S. Yancy, and Terry Lee Jarvis. The murders were made capital because they were multiple murders committed "by one act or pursuant to one scheme or course of conduct." See § 13A-5-40(a)(10), Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that Miller be sentenced to death. The trial court accepted the jury's recommendation and sentenced Miller to death.
On January 6, 2004, we remanded this case for additional action by the circuit court. See Miller v. State, 913 So.2d 1148 (Ala.Crim.App.2004). The circuit court has complied with our instructions and on return to remand has submitted (1) an amended sentencing order containing specific findings of fact regarding the existence of the aggravating circumstance that this offense was especially heinous, atrocious, or cruel when compared to other capital offenses, and (2) an order denying Miller's motion for a new trial making specific written findings of fact regarding each of the claims raised during the hearing on Miller's motion for a new trial.

Facts
The evidence presented at trial tended to establish the following. Around 7:00 a.m. on August 5, 1999, Johnny Cobb arrived at his place of employment, Ferguson Enterprises in Pelham. Cobb, the vice president of operations, recognized several other vehicles in the company's parking lot as belonging to sales manager Scott Yancy and delivery truck drivers Lee Holdbrooks and Alan Miller. As Cobb prepared to enter the building, he heard some loud noises and what sounded like someone screaming. Cobb opened the front door and saw Miller walking toward him. Miller, who was armed with a pistol, pointed the pistol in the general direction of Cobb and stated, "I'm tired of people starting rumors on me." Cobb tried to get Miller to put the pistol down, but Miller told him to get out of his way. Cobb ran out the front door and around the side of the building. Miller then left the building, walked over to his personal truck, and drove away.
After Cobb heard Miller drive away, he went back inside the building. He saw Christopher Yancy on the floor in the sales office and Lee Holdbrooks on the floor in the hallway. Both men were covered in blood and showed no signs of life. They appeared to have been shot multiple times. Cobb used his cellular telephone to summon the police, who were dispatched at 7:04 a.m. Minutes later, officers from the Pelham Police Department arrived to investigate the shooting.
After Cobb told the police officers what he had seen, the officers entered the building. There, they found the body of Christopher Yancy slumped to the floor, underneath a desk in the sales office. Lee Holdbrooks was lying face down in the hallway at the end of a bloody "crawl trail," indicating that he had crawled 20-25 feet down the hall in an attempt to escape his assailant. The officers secured the scene and waited for evidence technicians to arrive. Cobb provided a description of Miller's clothing and the truck he was driving. This description was transmitted *1155 to police headquarters and sent out over the police radio by the police dispatcher. Evidence technicians recovered nine .40-caliber shell casings from the scene.
While officers began investigating the crime scene at Ferguson Enterprises, Andy Adderhold was arriving for work at Post Airgas in Pelham. Adderhold, the manager of the Pelham store, arrived shortly after 7:00 a.m. Adderhold entered the office and talked with Terry Jarvis, another employee, for a few minutes before continuing to another office. At this point, Adderhold noticed Miller  a former employee of Post Airgas  enter the building. Miller walked toward the sales counter and called out to Jarvis: "Hey, I hear you've been spreading rumors about me." As Jarvis walked out of his office and walked into the area behind the sales counter, he replied, "I have not." Miller fired several shots at Jarvis. As Jarvis fell to the floor, Adderhold crouched behind the counter. Miller then walked behind the counter and pointed the pistol at Adderhold's face. Adderhold begged for his life. Miller paused, then pointed to a door, and told him to get out. Adderhold stood up and, as he began to move toward the door, heard a sound from Jarvis. When Adderhold paused and looked back at Jarvis, Miller repeated his order to "get out  right now." At this Adderhold left the sales area. As Adderhold was leaving the building, he heard another gunshot. Adderhold proceeded out of the back of the building, climbed over a fence to a neighboring building, where he used someone's cellular telephone to summon the police.
The second emergency call came in to the Pelham Police Department at approximately 7:18 a.m. Upon arrival, officers entered the building housing Post Airgas and found Jarvis's body on the floor behind the sales counter. Jarvis had sustained several gunshot wounds to his chest and abdomen. After securing the scene, officers recovered six .40-caliber spent shell casings from the floor of the sales area. Adderhold was interviewed, and he recounted the events surrounding Jarvis's murder.
After a description of Miller and the vehicle he was driving was transmitted over the police radio, law-enforcement officers combed the area in search of Miller. Pelham police sergeant Stuart Davidson and his partner were patrolling Interstate 65 near Alabaster when word of the second shooting was broadcast. Upon hearing that Miller was still in the vicinity of Pelham, Davidson exited I-65 to head back to Pelham. As Davidson turned back toward Pelham, he spotted a truck matching the description of Miller's entering I-65 from Highway 31 in Alabaster. Davidson radioed for backup and followed the truck south on I-65 into Chilton County. Once additional officers were in place as backup, law-enforcement officers initiated a traffic stop of the truck. Following the traffic stop, officers were able to positively identify the driver as Miller. Miller was ordered to get out of the truck, and he was forcibly subdued and handcuffed after resisting efforts to place him in custody. After placing Miller in the back of a patrol car, officers secured his truck. Inside the truck, they found a Glock brand pistol lying on the driver's seat. The pistol contained 1 round in the chamber and 11 rounds in the magazine. An empty Glock ammunition magazine was found on the passenger seat. Miller was transported to the Pelham Police Department where he was charged with murder.
At trial, the State called various witnesses who testified concerning the events of August 5, 1999. Evidence was also introduced regarding ballistics testing of the spent shell casings found at both murder sites; the testing matched all of the shell casings to the .40-caliber Glock pistol *1156 found on Miller. Dr. Stephen Pustilnik, a state medical examiner with the Alabama Department of Forensic Sciences, testified that the cause of death for all three victims was multiple gunshot wounds. Lee Holdbrooks  whose body was found in the hallway  was shot six times in the head and chest; although several of the wounds were nonfatal, one of the head wounds was fired at very close range and would have been immediately incapacitating and fatal. Based on "blood splatter" analysis and the positioning of the body, Dr. Pustilnik concluded that Holdbrooks was turning his head and looking up when the fatal shot was fired.
Scott Yancy was shot three times; one of the shots struck the aorta, which would have caused Yancy to "bleed out" within 15-20 minutes, while another wound would have caused paralysis. At the time he was shot, Yancy was underneath a metal desk; there was no indication that he ever moved from this position.
Terry Jarvis was shot five times; one of the shots struck Jarvis's liver and another his heart. Jarvis had already fallen to the floor when he was shot in the heart. Based on "blood splatter" analysis, Dr. Pustilnik concluded that Miller was standing over Jarvis as he shot him in the heart. Despite the nature of this wound, Jarvis could have lived anywhere from several minutes to 15 minutes after being shot.
Miller's defense counsel rested without putting on any evidence. After both sides had rested and the trial court instructed the jury on the law applicable to Miller's case, the jury determined that the murders of Holdbrooks, Yancy, and Jarvis were committed pursuant to a common scheme or plan, and it convicted Miller of capital murder.
During the penalty phase of Miller's trial, the State resubmitted all of the evidence it had introduced during the guilt phase. The State also presented brief testimony from three family members of the victims. One witness testified on behalf of each victim.
Miller offered the testimony of one witness during the penalty phase. Dr. Charles Scott, a forensic psychiatrist, testified regarding Miller's mental state at the time of the offenses. In preparing his report, Dr. Scott reviewed police records and witness statements, interviewed Miller and various family members, and arranged for psychological testing. Dr. Scott also reviewed Alabama's statutory definition of insanity. Based on this evidence, Dr. Scott determined that Miller was mentally ill at the time of the offenses. In Dr. Scott's opinion, Miller suffered from a delusional disorder that substantially impaired his rational ability. This delusional disorder  coupled with Miller's history as a loner  resulted in Miller's believing the people he worked with talked about him and that they had spread rumors about him. Miller believed that Terry Jarvis had told other employees at Post Airgas that Miller was a homosexual. However, Dr. Scott concluded, Miller's condition did not rise to the level of mania necessary to establish an insanity defense under Alabama law.
According to Dr. Scott, in the weeks immediately before the shootings, Miller became more and more agitated about the perceived harassment by his current and former coworkers. On the morning of the shooting, Miller told Dr. Scott that although he "felt an increased feeling of pressure" as he entered Ferguson Enterprises, he was not thinking of shooting Holdbrooks and Yancy. However, Miller recounted to Dr. Scott, when Holdbrooks "smarted off" to him, it "was like the straw that broke the camel's back" and he pulled out his pistol and began shooting. Following the shooting, all Miller could think of *1157 was shooting Terry Jarvis, so he drove to Post Airgas and shot him. After that, Miller told Dr. Scott that he felt as if the pressure had been lifted off him and that everything was calm.
After both sides had rested and the trial court instructed the jury on the law applicable to the penalty phase, the jury returned an advisory verdict recommending that Miller be sentenced to death.

Standard of Review
In every case where the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim. App.1999), aff'd, 820 So.2d 152 (Ala.2001):
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young. 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Although Miller's failure to object at trial will not preclude this Court from reviewing an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
Some of the issues Miller raises on appeal were not first brought to the trial court's attention. Accordingly, this Court's review of those matters is limited to review under the plain-error doctrine.

Guilt-Phase Issues

I.
Miller argues that his conviction and death sentence are due to be vacated because, he says, he lacked the necessary intent to commit murder. Specifically, Miller contends that his mental instability at the time of the offenses prevented him from forming the requisite mental intent to commit intentional murder, as required by § 13A-5-40(a), Ala.Code 1975. Because this claim is presented for the first time on appeal, it will be reviewed under the plain-error doctrine.
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light *1158 most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034 (Ala. Crim.App.1998) (quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala.1985)). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997) (quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App. 1992)). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696 (Ala.Crim. App.1998) (quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990)). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). "The question whether a defendant intentionally caused the death of another person is a question of fact for the jury. Carr v. State, 551 So.2d 1169 (Ala.Cr.App.1989)." Ex parte Carroll, 627 So.2d 874, 878 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). "The question of intent is hardly ever capable of direct proof. Such a question is normally a question for the jury. Loper v. State, 469 So.2d 707 (Ala.Cr.App.1985)." Lucas v. State, 792 So.2d 1161, 1168 (Ala.Crim. App.1999), rev'd on other grounds, 792 So.2d 1169 (Ala.2000).
During the guilt phase of the trial, Miller offered no evidence in his defense. Although it appears that Miller initially asserted a defense of not guilty by reason of mental disease or defect, this defense was withdrawn before trial. Therefore, the jury was not asked to determine whether Miller was mentally capable of forming the requisite mental intent to intentionally murder the three victims pursuant to a common scheme or plan. Indeed, Miller's claim that he lacked the requisite mental intent to commit murder is based on the testimony of Dr. Charles Scott, which was not presented until the penalty phase of his trial. Moreover, even Dr. Scott conceded that Miller's mental condition did not rise to the level of mania necessary to establish an insanity defense under Alabama law. Here, the jury was charged on the capital offense of the intentional murder of three persons pursuant to a common scheme or course of conduct and the lesser-included offense of the intentional murders of the three victims that were not committed pursuant to a common scheme or plan. The trial court instructed the jury that it must find the requisite intent by proof beyond a reasonable doubt as an element of the charged offense. Because no insanity defense was presented, the jury was not asked to determine Miller's ability to form the requisite intent to commit intentional murder. We know of no caselaw requiring a trial court to charge the jury on an affirmative defense that is withdrawn before trial begins.
Based on the evidence presented during the guilt phase of Miller's trial, the jury concluded that Miller's conduct was intentional. The testimony of the surviving witnesses, Johnny Cobb and Andy Adderhold  together with the forensic evidence  established that Miller intentionally drew his pistol and shot his three victims multiple times. Given these circumstances, we find no merit to Miller's claim that the trial court should have submitted his insanity defense to the jury for its consideration, despite the fact that *1159 that defense was withdrawn before trial. Accordingly, no basis for reversal exists as to this claim.

II.
Miller next argues that he was denied the effective assistance of counsel at both the guilt phase and the penalty phase of his trial. Miller, who was represented by new counsel appointed following his conviction and sentence, presented his ineffective-assistance-of-counsel claims in his motion for a new trial.
"At a hearing on a motion for new trial, the defendant has the burden of proving the allegations of his motion to the satisfaction of the trial court." Miles v. State, 624 So.2d 700, 703 (Ala.Crim.App. 1993) (citing Anderson v. State, 46 Ala. App. 546, 547, 245 So.2d 832, 833 (1971), and Jones v. State, 31 Ala.App. 504, 507, 19 So.2d 81, 84 (1944)). "The trial court's ruling on a motion for a new trial is presumed to be correct and will be upheld on appeal unless found to be clearly erroneous." Taylor v. State, 808 So.2d 1148, 1171 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002) (citing Ex parte Frazier, 562 So.2d 560, 570 (Ala.1989)).
At the hearing on Miller's motion for a new trial, Mickey Johnson, Miller's trial counsel, testified. Johnson stated that when he was appointed to represent Miller on the day of the shootings, he had been practicing law for 25 years. He met with Miller shortly after Miller was apprehended and again later that night. That same day, Johnson also met with several Pelham police officers and with Miller's mother.
Johnson had litigated five or six capital-murder cases before he was appointed to represent Miller. Roger Bass was initially appointed cocounsel; however, when Bass withdrew, Ronnie Blackwood was appointed to serve as cocounsel.
Johnson met with Miller on a number of occasions before trial. Before forming a strategy for Miller's case, Johnson reviewed all of the investigative reports, diagrams, statements, photographs, videotapes, and scientific reports; he also talked with his client. Johnson filed a motion requesting funds for an independent psychological evaluation of Miller. The trial court granted his motion, and Johnson retained Dr. Charles Scott from the University of California to evaluate Miller. After talking with Dr. Scott and reviewing Dr. Scott's written report, Johnson determined that there was insufficient evidence to raise an insanity defense during the guilt phase. In his opinion, it was better to present Dr. Scott's testimony during the penalty phase because presenting his testimony at the guilt phase would have negated Dr. Scott's credibility and lessened the potential impact of the evidence during the penalty phase. Johnson made this decision after reviewing the reports from other mental-health evaluations of Miller, which were consistent with Dr. Scott's findings.
After reviewing the evidence, Johnson made a strategic decision to concentrate his efforts and defense on the penalty phase of the trial. In his opinion, the State's evidence of Miller's guilt "was too overwhelming to seriously contest," given that he had no valid legal defense for the guilt phase. Accordingly, Johnson decided to concentrate on saving Miller's life.
Johnson focused his efforts during the guilt phase on maintaining credibility with the jury. In accordance with this strategy, he admitted to the jury early on in the proceedings that the evidence of Miller's guilt was strong because he wanted to lessen the impact of the evidence against Miller. Johnson felt that his duty during *1160 the guilt phase was to make the State meet its burden of proof.
During the penalty phase, Johnson presented a diminished-capacity defense. Through Dr. Scott's testimony, he presented two mitigating circumstances. He also argued the undisputed mitigating circumstance of no prior criminal history. During the penalty phase, Johnson argued that the State had failed to prove any aggravating circumstances. He also wanted to point out to the jury that the mitigating circumstances were undisputed. Johnson hoped that the jury was looking for a reason not to recommend the death penalty, and that his arguments would give the jury a sound legal basis for recommending a sentence of life imprisonment without the possibility of parole.
Before the penalty phase, Johnson talked with Miller's parents and other family members. He considered calling them as witnesses. However, after talking with Miller's family, he determined that it was best to present Miller's social and family history through Dr. Scott's testimony. In Johnson's opinion, Dr. Scott was a credible witness. Johnson also believed that the support Miller had from his family members during trial was affecting the jury in a positive way. Johnson believed that the jurors sympathized with Miller's family and he did not want to detract from this sympathy by putting family members on the stand.
Miller presented testimony from two other witnesses in support of his motion for a new trial. Dr. Bob Wendorf, a clinical psychologist, testified that based on his review of Dr. Scott's report, he believed there were other possible mitigating factors Johnson could have presented. Miller also elicited testimony from Aaron McCall with the Alabama Prison Project. McCall indicated that he had sent Johnson a letter in August 1999, offering his services in Miller's case. However, McCall testified, Johnson never responded to his letter.
To prevail on a claim of ineffective assistance of counsel, a defendant must establish (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987). "The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under `prevailing professional norms,' was `reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Crim.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. 2052.
A defendant is not entitled to an error-free trial, and the fact that trial counsel made a mistake is not enough to show that counsel's performance was ineffective. See Cosby v. State, 627 So.2d 1059 (Ala.Crim.App.1993). Moreover, the fact that trial counsel did not object at every possible instance does not mean that a defendant's counsel was incompetent. See O'Neil v. State, 605 So.2d 1247, 1250 (Ala. Crim.App.1992). An attorney is not required to raise every conceivable claim available at trial or on appeal in order to render effective assistance. Thomas v. State, 766 So.2d 860 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000); Holladay v. State, 629 So.2d 673 (Ala.Crim.App. 1992).
When reviewing a claim of ineffective assistance of counsel, this Court indulges a strong presumption that counsel's *1161 conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Crim. App.1992); Luke v. State, 484 So.2d 531 (Ala.Crim.App.1985). Moreover, this Court should avoid using "hindsight" to evaluate counsel's performance. Instead, we must consider the circumstances surrounding the case at the time of counsel's actions before determining whether counsel's assistance was ineffective. Hallford, 629 So.2d at 9; see also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Crim.App.1994).

A. Guilt-phase claims

Miller contends that his counsel's opening remarks indicated that counsel was serving "more like a second prosecutor" rather than defense counsel. In a similar vein, Miller claims that he was prejudiced by his counsel's decision not to put on an insanity defense during the guilt phase of his trial. Miller also complains of counsel's admission during the guilt stage of the trial that his defense was "feeble at best." Akin to this claim are Miller's allegations that his defense was prejudiced by counsel's failure to adequately cross-examine the State's witnesses and his failure to call any witnesses.
However, as indicated by counsel's testimony at the hearing on his new-trial motion, those decisions were made after a thorough investigation of the relevant law and facts of Miller's case. This is not a case where counsel failed to investigate a potential mental-health defense or neglected to interview potential defense witnesses. Instead, Johnson's decision was part of his strategy to spare Miller's life. See Samra v. State, 771 So.2d 1108, 1120 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122 (Ala.), cert. denied, 531 U.S. 933, 121 S.Ct. 317, 148 L.Ed.2d 255 (2000). "Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable." Ex parte Lawley, 512 So.2d at 1372. Further, a mere difference of opinion between a defendant and his trial counsel is insufficient to render counsel's performance ineffective. Patrick v. State, 680 So.2d 959, 962 (Ala.Crim.App. 1996). Under the circumstances of this case, defense counsel made a well-reasoned decision to focus his efforts on that part of the trial that he believed offered the greatest chance of success. We see no reason to second-guess defense counsel's decisions regarding this strategy.
Miller also contends that his trial counsel's representation was deficient because counsel did not use evidence regarding Miller's delusions to show the murders were committed in a heat of passion, rather than as part of a common scheme or plan. Miller cites no authority for this contention. Likewise, our research has failed to locate any Alabama authority that supports such a proposition. The fact that a victim may have spread rumors about the defendant or "smarted off" to a defendant is insufficient to mitigate an intentional killing under any doctrine of provocation or heat of passion. See, e.g., Bone v. State, 706 So.2d 1291, 1297 (Ala.Crim. App.1997) (citing Harrison v. State, 580 So.2d 73, 74 (Ala.Crim.App.1991) (mere words or gestures will not reduce a homicide from murder to manslaughter)).
Finally, Miller challenges counsel's decision not to move for a change of venue. However, Miller has failed to establish any basis for such a claim. Indeed, this court rejected similar change-of-venue claims in two other high-profile capital-murder prosecutions that occurred in Shelby County. In one of those cases, this Court noted:
"`The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 *1162 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.' Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App. 1992). `"Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial."' Whisenhant v. State, 555 So.2d 219, 224 (Ala.Cr.App. 1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).
"`In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is "presumed prejudice" resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).'
"Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994)."
Samra v. State, 771 So.2d at 1113; accord Duke v. State, 889 So.2d 1, 15 (Ala.Crim. App.2002).
Here, the potential for actual juror prejudice was addressed through voir dire during the selection of the jury. Through the use of juror questionnaires and individual voir dire, any potential jurors who may have had fixed opinions regarding Miller's guilt were excused from service. Nor was there any showing that media coverage created a presumption of actual prejudice. See Ex parte Travis, 776 So.2d 874, 879 (Ala.2000). Given these circumstances, defense counsel cannot be said to have rendered ineffective assistance by not seeking a change of venue where there was insufficient evidence to show that he was entitled to such a change. See, e.g. Bedwell v. State, 710 So.2d 493, 497 (Ala.Crim.App. 1997) ("Counsel cannot be said to be ineffective for failing to file a motion for which there is no legal basis.").

B. Penalty-phase claims

Miller contends that trial counsel's opening statement at the penalty phase prejudiced his defense and any mitigating evidence to be presented during the penalty-phase portion of his trial. Specifically, Miller claims that counsel's opening statement undermined the credibility of the only defense witness being offered  Dr. Charles Scott. The end result of counsel's opening statement, Miller claims, suggested to the jury that Miller deserved to be sentenced to death.
We have reviewed trial counsel's opening statement in its entirety. Consistent with counsel's trial strategy  as testified to during the hearing on Miller's new-trial motion  counsel elected to acknowledge Dr. Scott's conclusion that there was no basis under Alabama law to support an insanity defense in an effort to retain his credibility before the jury and to secure an advisory verdict of life imprisonment without parole, rather than the death sentence. Given the overwhelming evidence of Miller's guilt  including eyewitness testimony identifying Miller as the shooter  counsel had little choice but to acknowledge Miller's guilt. Accordingly, counsel attempted to gain the jury's sympathy by using Dr. Scott's testimony to portray Miller as a *1163 "tortured soul" whose delusions drove him to commit a series of horrific acts. Indeed, our review of counsel's argument reveals it to be an impassioned plea that the jury spare Miller's life.
Miller also contends that counsel was ineffective because he failed to exclude "victim impact" testimony offered by the victims' family members. As will be discussed in Part IV of this opinion, that testimony was admissible. See, e.g., Taylor v. State, 808 So.2d 1148, 1167 (Ala. Crim.App.2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002); Boyd v. State, 746 So.2d 364, 383 (Ala.Crim.App. 1999).
Miller further contends that trial counsel's failure "to adequately explore all possible mitigating routes" left counsel unable to make well-informed decisions on the question of mitigation. As set out above, counsel testified at length regarding his representation of Miller, including his investigation of the relevant law and facts, and his strategy to save Miller from a sentence of death. Counsel explained his reasons for presenting evidence regarding Miller's family and social history through Dr. Scott's testimony, rather than through various family members. Based on our review of the record, we fail to see what other mitigating evidence counsel could have offered. Moreover, despite Miller's allegations, he offers no additional mitigating evidence that counsel did not discover during his investigation or that counsel failed to consider in formulating his defense strategy. Accordingly, we are unable to say that counsel was ineffective as to this claim. See Lawhorn v. State, 756 So.2d 971, 986 (Ala. Crim.App.1999).
Miller contends that trial counsel's performance was deficient because he failed to challenge the constitutionality of the statutory aggravating circumstance set out in § 13A-5-49(8), that the capital offense of which he was convicted was "especially heinous, atrocious, or cruel compared to other capital offenses." As will be discussed in Part V of this opinion, this Court has consistently recognized the constitutionality of this aggravating circumstance. See, e.g., Ingram v. State, 779 So.2d 1225, 1277 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000). Because there was no merit to this claim, counsel's performance was not deficient for failing to raise it. See, e.g., Thomas v. State, 766 So.2d at 950; Bedwell v. State, 710 So.2d at 497.

Penalty-Phase Issues

III.
Miller argues that his death sentence should be vacated because, he says, "Capital punishment as practiced throughout this nation, as well as in this State, is performed in an arbitrary and capricious manner which violates the basic principles providing the foundation of our legal system." Additionally, he argues that the "use of electrocution as a means of execution is inherently cruel and inhumane."
This Court has consistently rejected broad general allegations that Alabama's capital-punishment statute is unconstitutional. See, e.g., Clark v. State, 896 So.2d 584, 597 (Ala.Crim.App.2000) (opinion on return to remand); Williams v. State, 627 So.2d 985, 993 (Ala.Crim.App.1991), aff'd, 627 So.2d 999 (Ala.1993).
"There is an abundance of caselaw ... that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala. Cr.App.1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala.1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d *1164 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."
Scott v. State, 728 So.2d 164, 171 (Ala. Crim.App.1997), aff'd, 728 So.2d 172 (Ala. 1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).
Miller offers no novel arguments in support of his contention. Accordingly, we rely on our previous holdings and reject his contention that the manner of execution  electrocution  used by the State of Alabama constitutes cruel and unusual punishment. We further note the enactment by the Legislature of Act No. 2002-492, Ala. Acts 2002, which provides for lethal injection as an alternate means of execution. Act No. 2002-492 became effective July 1, 2002. The passage of this Act effectively rendered Miller's constitutional challenge to the method of execution in this State moot.

IV.
During the penalty phase of Miller's trial, the State offered testimony by Lee Holdbrooks's father, Scott Yancy's father, and Terry Jarvis's sister, concerning each of the three victims. Each witness offered a brief statement regarding how the victims' deaths had affected the family members left behind. No objection was made to this testimony.
Miller now argues that the trial court erred in admitting "victim impact" testimony because, he says, the sole purpose of this evidence was to inflame the passions of the jury during the penalty phase of his trial. Specifically, he argues that § 13A-5-45(c), Ala.Code 1975, mandates that to be relevant and admissible during the penalty phase of trial victim-impact testimony must relate to one of the aggravating circumstances set out in § 13A-5-49, Ala.Code 1975.
Miller's contention is incorrect. The United States Supreme Court has specifically recognized the admissibility of victim-impact testimony to offer the jury a "quick glimpse" of the uniqueness of the life taken by the defendant. Payne v. Tennessee, 501 U.S. 808, 823, 830-31, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Moreover, this Court has followed the holding in Payne v. Tennessee on numerous occasions, recognizing the admissibility of evidence of this kind as relevant to the determination of the appropriate punishment to be imposed. See, e.g., Taylor v. State, 808 So.2d 1148, 1167 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002).
"`If a State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.'"
Boyd v. State, 746 So.2d 364, 383 (Ala. Crim.App.1999) (quoting Payne v. Tennessee, 501 U.S. at 827, 111 S.Ct. 2597). See also McNair v. State, 653 So.2d 320, 331 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) ("[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial.").
*1165 Here, the glimpse into the lives taken by Miller was properly presented to the jury by way of brief testimony offered by the three family members. (R. 1345-51.) This testimony was relevant to determining the appropriate punishment. See Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000) ("`evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case'"). Accordingly, no basis for reversal exists as to this claim.

V.
Miller argues that the trial court erred in finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Specifically, Miller challenges the constitutionality of this aggravating circumstance, as well as the evidence upon which the court based its finding that this aggravating circumstance was applicable to this case. (Appellant's brief, parts II and V.)
This Court has addressed the constitutionality of the "especially heinous, atrocious, or cruel" aggravating circumstance on numerous occasions. We have consistently upheld the constitutionality of this aggravating circumstance:
"To the extent that Ingram is claiming that the `especially heinous, atrocious or cruel' statutory aggravating circumstance found in § 13A-5-49(8)[, Ala. Code 1975], is unconstitutionally vague and overbroad on its face, that contention is without merit. See Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999); Bui v. State, 551 So.2d 1094 (Ala. Crim.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); Hallford v. State, 548 So.2d 526 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)."
Ingram v. State, 779 So.2d 1225, 1277 (Ala. Crim.App.1999), aff'd, 779 So.2d 1283 (Ala. 2000). See also Duke v. State, 889 So.2d 1, 36 (Ala.Crim.App.2002).
When considering whether a particular capital offense was "especially heinous, atrocious, or cruel," this Court adheres to the standard set out in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
With regard to the application of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel, the circuit court made the following findings of fact on remand:
"On the morning of August 5, 1999, Defendant shot and killed three men, namely, Christopher Yancy (`Yancy'), age 28 years; Lee Holdbrooks (`Holdbrooks'), age 32; and Terry Jarvis (`Jarvis'), age 39 years. Yancy and Holdbrooks were both shot at one location and thereafter Jarvis was shot at another location. Each of those victims sustained multiple wounds.
"Yancy suffered three wounds to his body. It appears the first shot entered his leg and traveled through his groin and into his spine, paralyzing him. He was unable to move, unable to defend himself and was trying to hide from Defendant under a desk. Yancy had a cell phone an inch or two from his hand, but because of his paralysis was unable to reach it and call for help. Yancy had to have been afraid his life was about to be taken. Moments elapsed. Defendant appeared to have then stooped under the desk and have made eye contact with Yancy before shooting him twice more causing his death.

*1166 "Holdbrooks suffered six wounds to his body. Defendant shot Holdbrooks several times. Holdbrooks crawled down a hallway for about twenty-five feet. Holdbrooks was uncertain whether he would live or die as he crawled down the hallway and quite possibly his life was flashing by in his mind. Defendant took his gun and within two inches of Holdbrooks' head, pulled the trigger for the sixth and final time, the bullet entering Holdbrooks' head causing him to die in a pool of blood.
"Jarvis was shot five times, the last shot being no more than 46 inches away from his body. Before Jarvis was shot, Defendant had pointed a gun at him in the presence of a witness. Defendant had accused Jarvis of spreading rumors about him which Jarvis had denied. Defendant shot Jarvis four times in the chest. Defendant allowed the witness to leave. No one knows at that point what went through Jarvis' mind. Having denied he spread any rumors, he must have wondered why Defendant had not believed him and as the witness was allowed to leave that maybe there would be no more shooting and his life would be spared. Defendant then shot Jarvis through his heart ending Jarvis' life.
"It appears all three of Defendant's victims suffered for a while not only physically, but psychologically. In each instance, there appeared to have been hope for life while they were hurting, only to have their fate sealed by a final shot, execution style.
"Based upon the facts presented at this trial, these murders were calculated, premeditated and callous, with utter disregard of human life. The taking of these lives was among the worst in the memory of this Court and was well beyond the level of being especially heinous, atrocious or cruel."
In Taylor v. State, 808 So.2d 1148 (Ala. Crim.App.2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002), we addressed the application of this aggravating circumstance. We find the following language to be particularly relevant to this case:
"The Alabama appellate courts' interpretation of `especially heinous, atrocious, or cruel' has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Ex parte Clark, [728 So.2d 1126 (Ala.1998)], citing, Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989). The Alabama appellate courts have considered the infliction of psychological torture as especially indicative that the offense was `especially heinous, atrocious or cruel.' Thus, the mental suffering where a victim witnesses the murder of another and then realizes that soon he or she will also be killed, has been found to be sufficient to support a finding of this aggravating circumstance. Norris v. State, 793 So.2d 847, 854 (Ala. Cr.App.1999). As the trial judge pointed out in his sentencing order, two of the victims here witnessed Taylor kill another victim. Both tried to run and hide, but were captured. Both begged and pleaded for their lives; one offering money and property, the other pleading for the sake of her children. Both were deliberately and methodically executed with a gunshot to the head as they pleaded for their lives. These murders were not accomplished in a rapid-fire manner; there was sufficient time between the three murders for the next victim to be placed in significant fear for his or her life, and the evidence *1167 is clear that each was well aware of what was about to happen."
808 So.2d at 1169.
Here, just as in Taylor, there was sufficient time between the initial gunshot wounds and the final, fatal shots for each of the victims to realize his fate. Given the circumstances, the trial court properly concluded that the murder of the three victims was "especially heinous, atrocious, or cruel." See Ex parte Clark, 728 So.2d 1126, 1140 (Ala.1998).

VI.
After this case was argued and submitted, the United States Supreme Court released Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)  two cases that dramatically impacted death-penalty cases throughout the United States. We requested that Miller and the attorney general brief the issue of the applicability of Ring to Miller's conviction and death sentence.[1] We now address those arguments.[2]
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S.Ct. 2428.
Miller argues that imposition of the death penalty in Alabama requires fact-finding by a jury relating to both the existence of aggravating circumstances and the weighing of the aggravating circumstances against the mitigating circumstances. Because only the trial judge made these findings and the jury was not given the opportunity to return a verdict on any of the aggravating circumstances in his case, he argues that the Supreme Court's holding in Ring renders him ineligible for the death penalty. Miller also argues that because the jury was instructed that its verdict and findings were advisory, no reliable finding as to aggravating circumstances could have been made by the jury. Miller further argues that the indictment against him is void because, he says, it failed to specify the aggravating circumstances that supported the capital offense. Finally, Miller argues that both Alabama and federal law condemn the imposition of the death penalty by a judge, rather than by a jury.
The State counters by arguing that Miller's death sentence complies with Ring because the jury found at the guilt phase that Miller had committed a capital offense, thus making him eligible for the death sentence. Accordingly, the circuit court had the discretion under Ring to impose either the death sentence or a lesser sentence, with or without the jury's approval.
In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's rationale that Ring did not invalidate Alabama's law, *1168 which vests the ultimate sentence determination in the hands of the trial judge and not a jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Duke v. State, 889 So.2d 1, opinion on return to remand, 889 So.2d 40 (Ala.Crim.App.2002); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim. App.2002); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand). In each of these cases, we recognized the narrowness of the holding in Ring, noting that "[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt"; however, we noted that the Ring Court "did not reach the question whether judicial sentencing or judicial override was constitutional." Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand). Indeed, we quote the following language from a footnote in Ring:
"Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-491, n. 16 (2000) (noting `the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation' (citation omitted [in Ring])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252 (1976) (plurality opinion) (`[I]t has never [been] suggested that jury sentencing is constitutionally required.'). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S. at 477, n. 3 (Fourteenth Amendment `has not ... been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury"')."
536 U.S. at 597 n. 4, 122 S.Ct. 2428 (emphasis added).
Here, the jury in the guilt phase entered a verdict finding Miller guilty of capital murder. Miller's case, however, differs from that of Waldrop, Hodges, Turner, and Stallworth because at the time Miller committed these offenses, the fact that the defendant "intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct" did not, alone, constitute an aggravating circumstance.[3] However, this does not require that Miller's death sentence be set aside. The State argues that once a jury returns a verdict finding the defendant guilty of capital murder, that defendant becomes "death-eligible." It is unnecessary to address the State's argument because the jury's 10-2 recommendation *1169 of death during the sentencing phase indicated that it must have found the existence of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel compared to other capital offenses." § 13A-5-49(8), Ala.Code 1975. This was the only aggravating circumstance the court instructed the jury on. Indeed, during the court's penalty-phase instructions, the court clearly instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it first found beyond a reasonable doubt the existence of at least one aggravating circumstance. (R. 1433-35.) Thus, the jury's 10-2 vote recommending death established that the jury unanimously found the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance,[4] giving the trial judge the discretion to sentence Miller to death. See § 13A-5-46(e)(1)-(3), Ala.Code 1975; see also Ex parte Slaton, 680 So.2d 909, 927 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Duke v. State, 889 So.2d 1, opinion on return to remand, 889 So.2d 40 (Ala.Crim.App.2002).
Based on the foregoing, we conclude that Miller's claims regarding Ring v. Arizona are not supported by Alabama law.

VII.
As required by § 13A-5-53, Ala. Code 1975, we will now address the propriety of Miller's conviction and sentence of death.
Miller was indicted and convicted of murdering two or more people "by one act or pursuant to one scheme or course of conduct." § 13A-5-40(a)(10), Ala.Code 1975. The jury by a vote of 10-2 recommended that Miller be sentenced to death.
The record reflects that Miller's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The court found one aggravating circumstance  that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found the existence of three mitigating circumstances: (1) that Miller had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975; (2) that Miller committed the offense while he was under the influence of extreme mental or emotional distress, see § 13A-5-51(2), Ala. Code 1975; and (3) that the capacity of Miller to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, see § 13A-5-51(6), Ala.Code 1975. The trial court found that the aggravating circumstance outweighed the mitigating circumstances and mandated that Miller be sentenced to death.
With regard to the application of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel, the trial court made detailed findings, as set out in Part V of this opinion. These findings are supported by the evidence.
Moreover, the fact that the circuit court found the existence of only one aggravating circumstance and three mitigating circumstances does not indicate that the court's decision to sentence Miller to death *1170 was erroneous. In Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), this Court stated:
"`[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev'd on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.'
"Clisby v. State, 456 So.2d 99, 102 (Ala. Cr.App.1983)."
695 So.2d at 94. As the Alabama Supreme Court stated in Ex parte Cook, 369 So.2d 1251, 1257 (Ala.1978): "We can readily envision situations where several aggravating circumstances may not be sufficient to outweigh only one mitigating circumstance and, on the other hand, where numerous mitigating circumstances may be present but opposed to one aggravating circumstance so outrageous as to justify the death penalty." Accord Carr v. State, 640 So.2d 1064, 1074-75 (Ala.Crim.App.1994); Magwood v. State, 548 So.2d 512, 514 (Ala. Crim.App.), aff'd, 548 So.2d 516 (Ala. 1988), cert. denied, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989).
We find this to be the case here. The revised sentencing order indicates that the trial court considered the mitigating evidence Miller offered but determined that that mitigation was outweighed by the "heinous, atrocious, and cruel" method in which he killed three current or former coworkers simply because he believed that they were spreading rumors about him. The sentencing order shows that the court weighed the aggravating circumstance and the mitigating circumstances and correctly sentenced Miller to death. Its decision is supported by the record, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating circumstances and the mitigating circumstances independently to determine the propriety of Miller's death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate in this case.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Miller's death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Miller killed three people pursuant to a common scheme or plan. Similar crimes have been punished by death on numerous occasions. See, e.g., Duke v. State, 889 So.2d 1 (Ala. Crim.App.2002), opinion on return to remand, 889 So.2d 40; Samra v. State, 771 So.2d at 1121; Taylor v. State, 666 So.2d 36 (Ala.Crim.App.), opinion on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 *1171 S.Ct. 575, 107 L.Ed.2d 569 (1989); Siebert v. State, 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
Finally, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Miller's substantial rights and have found none. Miller's conviction and death sentence for the murders of Lee Michael Holdbrooks, Christopher S. Yancy, and Terry Lee Jarvis are due to be, and they are, hereby affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
NOTES
[1] We note that these two reports were referenced at various stages of the trial proceedings; however, the circuit clerk neglected to forward the reports to this Court as part of the certified record on appeal.
[1] Atkins addresses the rights of mentally retarded persons sentenced to death. Nothing in the record suggests that Miller was mentally retarded. Thus, because Atkins had no application to this case, we did not request that the parties address the applicability of Atkins.
[2] Because Rule 45A, Ala.R.App.P., requires this Court to search the record for any plain error and because Miller's case was not final when Ring was released, we have applied Ring to this appeal. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
[3] Section 13A-5-49, Ala.Code 1975, was amended effective September 1, 1999, to make this an aggravating circumstance. See § 13A-5-49(9), Ala.Code 1975.
[4] We note that Ring requires only that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible. Alabama law does not require that the jury's advisory verdict be unanimous before it can recommend death. See § 13A-5-46(f), Ala.Code 1975. Nothing in Ring supports Miller's claim that the jury's advisory verdict be unanimous.